Our first case for today is Glenn Burton and others against DuPont and others. I won't read off all the docket numbers. There's quite a few of them. But we will begin. I trust everybody can hear me. Everything is fine. All right. So we'll begin with Mr. Schmalzbach. Good morning, Judge Wood, and may it please the Court. Brian Schmalzbach for DuPont. Today, DuPont would like to address only one fundamental error that dismantled the crux of Wisconsin's risk contribution doctrine. Fungibility is the crux of that doctrine and the reason why Thomas excused the need to identify the responsible pigment manufacturer. But paints are not fungible. So it was an error for the District Court to expand risk contribution from white lead carbonate pigment to non-fungible paint. Mr. Schmalzbach, could I just ask, just to get me off at least on the right track. In some ways, it's a little strange reading the briefs because reading your brief, you make that point very clearly. And reading the Appelese brief, they seem to agree that this case is about pigments, not about paint. So what I'm wondering is whether what we really need to focus on is, in a sense, the alleged distribution of the pigments by means of there being an ingredient of the paint. So that's the best I could do to put this together in some sensible way. And I wonder if you could comment on that. Yes, thank you, Your Honor. I think you've identified the nub of the dispute. And what the record shows is that this really was a case about paint, not pigment. Because the evidence that plaintiffs introduced against DuPont included evidence between 1925 and 1966, when DuPont did not manufacture white lead carbonate pigment, but did manufacture paint. And to get specifically to your question about distribution, I think the nub of the plaintiff's case boils down to two words in a sentence that Thomas calls an element of a risk contribution claim. And what that sentence says is that the plaintiffs have to prove that pigment manufacturers produced or marketed white lead carbonate pigment. And what the plaintiffs would ask you to do is to ignore the first two words of that sentence. They want you to ignore the requirements of being a pigment manufacturer. And instead, they focus only on the last two words, or marketed. Because that's their theory of how the distribution of non-plungible paint might be implicated. In other words, to be clear, you think we need to read that as if it said the pigment manufacturers produced or the pigment manufacturers marketed, but not the pigment manufacturers produced or the companies marketed or somebody more general. Absolutely, Your Honor. There's no one else in that sentence. And when you look at marketing, the plaintiffs are wrong about what marketing means in this context. Because Thomas and Collins never say that you market a plungible raw ingredient just by selling a non-plungible finished product that happens to contain it. The way Collins uses marketing is Collins says that pill makers market DES by selling DES pills. So the product they're actually selling is the same plungible product that bulk DES manufacturers produce. And in any event, marketing can't mean what plaintiffs say for this reason. Because then on the one hand, you would have Thomas saying that plungibility is the crux of risk contribution. You would have Godoy saying that plungibility is a prerequisite for risk contribution. But then on the other hand, you would say risk contribution applies to a non-plungible product. That's the sole basis of the district court's opinion. It seems to me that that's what the court focused in on when it expanded the theory to the paint. Was there other language or something else that was pertinent to the district court? No, Your Honor. I think you have accurately characterized the district court's opinion. That it's those two words, or marketing, that the district court relies on. Mr. Schmalzbach, it's Judge Scudder. Can you help me on one thing that I tried to discern here? A case like this, as you all know very, very well, has a massive history to it. And I'm sure there were tens of millions of dollars, if not more, spent along the way in litigating it on both sides. But yet, it seems that this issue about the scope of risk contribution liability came to a head in motions in limine number 1147 and 1162 about six weeks or seven weeks before the trial. How is it in a matter like this that there was confusion about the scope of the applicable theory throughout such a massive stretch of the litigation? How did this happen? Your Honor, I think this happened because the plaintiff's theory changed. Throughout the first nine years of the case, DuPont and the other defendants relied on plaintiffs saying that they had sued us as pigment manufacturers, not paint manufacturers. And so we relied on that because that is indeed the theory of Thomas. And Thomas requires that you be a pigment manufacturer. And when, all of a sudden, at the motion in limine stage, plaintiffs tried to introduce additional evidence that we sought to exclude, that's when the change in theory became apparent, and it became apparent that we would need to move to exclude that evidence because it's beyond the scope of Thomas. You're breaking up a little bit. Hold on a second. I'm sorry. You were breaking up a little bit, and now you're gone. Am I still on audio, Your Honor? You are on audio right at the moment. I can't see you. All right. With leave of court, I will proceed on audio only. That would be fine. And we'll probably get you back in a minute. So if there's any doubt about the scope of Thomas, Godoy resolved that doubt because Godoy goes out of its way in footnote 10 to clarify that the product at issue in a Thomas case has to be pigment, not paint. And Godoy said that in footnote 10 because the Wisconsin Court of Appeals made the same error that the district court did here. In paragraph 3 of the Court of Appeals opinion in Godoy, the Court of Appeals said that Thomas applies to paint manufacturers. So, excuse me, Mr. Schmalzberg, so I take it you then are not contesting that at least for this brief period from 1917 to 1924, your client was, in fact, a pigment manufacturer. That's absolutely right, Your Honor. And I want to be very clear that the only relief DuPont is seeking on appeal is a new trial. And in that new trial, the plaintiffs can pursue a Thomas risk contribution claim against DuPont for those seven years when DuPont was a manufacturer of white lead carbon and pigment, but not for the subsequent four decades when DuPont made non-fungible paint. And so I'd like to walk through fungibility and why paint, which is the product that the district court expanded risk contribution to cover, is not fungible. Before you do so, Mr. Schmalzberg, let me just follow up on your last statement, please. So you – I was a little surprised you did not join in Sherwin-Williams' arguments with respect to the negligence in product liability claims. And I just want to confirm that. I think you just did. That's right, Your Honor. We are not – we have not joined that part of Sherwin-Williams' brief. We are not pursuing those arguments on appeal. The relief we're seeking is very narrow, and the relief we're seeking would leave plaintiffs the opportunity to pursue exactly the claim that Thomas does allow. And so they would have the opportunity to show that DuPont should be liable for those seven years during 1917 to 1924, but they would not have the opportunity to introduce evidence from 1925 all the way through 1966 as the basis for their risk contribution claim. So is it – I'm just – I want to make sure I'm not putting words in your mouth. It sounds to me in terms of this concept that the district court had that the pigments were being marketed through the sale of the paints, which mixed together the pigments and whatever the diluting substance may be, that you're at least saying that that goes beyond anything that Collins and Thomas recognized as eligible for this risk contribution theory, right? Yes, Your Honor. Okay. And the reason – in addition to contradicting Thomas insofar as it's limited to fungible products and limited to pigment manufacturers, the other problem with that expansion, which is just the right word for what happened, is Wisconsin's legislature forbade that expansion to other products because in Wisconsin Statute 895.046, the Wisconsin legislature said that whatever Thomas says, you cannot expand a risk contribution claim beyond products that are chemically identical. And different paints are not chemically identical. They contain – they're based on different formulas, contain different ingredients in different combinations. And so the paints are actually physically distinguishable. And so under the statute, that takes this case out of risk contribution. But we would have to overrule Gibson, wouldn't we, to find that that statute applies to the case here? No, Your Honor. We assume that Gibson is good law and correctly decided for purposes of our argument. Because what Gibson says is that you cannot retroactively apply the statute to a vested right. And so the question is whether this novel risk contribution claim that goes beyond Thomas is a vested right. And it's not because Thomas has the limitations to fungible products and to pigment manufacturers. And so this is not a previously existing common law claim. That's the term that Gibson uses. In order to be protected by Gibson, the claim would have to be a previously existing common law claim. And because this claim goes far beyond what Thomas allows and, Judge Schrader, to your point, goes far beyond the case that was presented for the first nine years of this litigation, it is not a previously existing vested right. And it is fully consistent with Gibson to apply the statute here. I see that I'm into my rebuttal time. If the Court has no further questions, I'll reserve my time. Thank you. Mr. DeGiulio. Good morning, and may it please the Court, Lady Julius of Genesee, on behalf of the appellate, the Sherwood Williams Company. We agree with DuPont that at a minimum the Court should order a new trial for misapplying the risk contribution theory. Godoy is clear the product at issue is pigment, not paint containing white lead carbon and pigments. But Sherwood Williams is asking the Court to enter judgment as a matter of law on this particular record. Before we get too far on that, Mr. DeGiulio, I want to ask this. Let's assume that the product is indeed pigment. I understand from this giant amount of things that I've read for this case that it is possible for a chemist to analyze paint that has been applied somewhere and figure out which pigment is in it, figure out that it's white lead carbonate. So wouldn't that lead us to say then that at least anyone who has been a pigment manufacturer, whether they were just manufacturing pigment and making their own paint, or they were selling the pigment for somebody else to put in paint, they were, in fact, distributing that pigment? Well, no, Your Honor. I think Godoy is very clear that the product at issue is white lead carbonate pigment. It's not paint. And in paint, there's a lot of reasons why paints aren't fungible. There's different formulas. I understand that. I understand that. But what I'm trying to get at is if you're going to get too literal about that, you would say that no one's liable for anything because people don't just buy the pigment. They buy the pigment either because they're going to mix it themselves as a master painter into some sort of paint or it's a commercial transaction in which they buy the pigment to mix themselves. So even if we all agree that it's pigment, there's a way that pigment gets from the point of manufacture to a place where it's in a paint on the wall. And we can at least identify that it's a paint with the WLC pigment. Well, that's correct, Your Honor. But what Thomas talked about was liability for manufacture and marketing of white lead carbonate pigments. There are companies or were companies like National Lead that produced white lead carbonate. They sold white lead carbonate as a product and advertised those products. The court error here is expanding that liability to a finished product of paint. And if the court looks at SWA page 52, which is the court's opinion, I'll quote from it. The court says it doesn't make sense to shield finished product manufacturers from a duty to warn about a dangerous component of their product in a case where component manufacturers are already shielded from that duty. And what the court's making clear, this was six weeks before trial, is that the finished product manufacturer could be liable for the finished product. That's the paint manufacturer for paint. And Godoy is very clear, not only in footnote 10 does it say the issue of the product is not paint, but it also says on page 679 that the defendants were sued as pigment manufacturers. And that switch from paint and paint manufacturers created all the problems that we see in this case because you have to start, what Godoy is clear about, you have to start from the product. But you're not disputing, Mr. Julius, are you, that just under a risk contribution theory, putting aside your arguments about the negligence and strict liability claims at issue here, you're not disputing that Sherwin-Williams could have been liable for the white lead carbonate pigment that it produced from 1910 to 1947 under the risk contribution theory, are you? What we're saying is the plaintiffs have never tried to make that case, Your Honor. So this case went to the jury as a finished paint case and paint manufacturers. The only pigment manufacturer that didn't make paint was held not liable in this case, Arco. The case was a paint case. So plaintiffs, our argument is plaintiffs should try to make that case. Godoy and Thomas both made clear that white lead carbonate pigment is a component. And that analysis of whether you are a manufacturer and distributor of a component was never conducted by the court. The jury wasn't instructed on that point, and that wasn't the argument that went to the case. And so they can make that case. Or alternatively, paint plaintiffs could bring a claim against paint manufacturers because it's not plungible, they can identify it. Hold on. I want to go back to the question Judge St. Eve asked, and maybe this tethers us back to where you were going to start. Your client, if I'm correct, manufactured white lead carbonate from, what, approximately 1910 to 1947? Correct, Your Honor. Okay. But I understood your brief to argue, and you can correct me if I'm mistaken, that your client should not be tried on any theory of negligence writ large, categorically. And the reason for that is the consequence of you receiving the benefit of a favorable summary judgment ruling on the negligent failure to warn claim that the plaintiff advanced. So that's how you're distinct from DuPont, right? You're saying under no circumstance should there be any trial on any theory of negligence as to Sherwin-Williams because of the consequence of that summary judgment ruling? Well, yes, Your Honor. What we're suggesting is that this case, and it's at the record sites SWA-11 and SWA-15, the court held that the plaintiff caregivers in this case had actual knowledge of the dangers that would have been warned of. And so for at least purposes of this case, we had a trial. We should have been granted summary judgment. We should have been granted JMOL. Because as a matter of law, when a plaintiff knows of the dangers that would have been warned of, there can be no negligence and there can be no strict liability. We set forth in our briefs that Wisconsin law requires a defect. As we recognize, there's only three defects in Wisconsin law, manufacturing defect, design defect, or failure to warn. Excuse me, Mr. DeGiulis. I understood that as a theory that you were advancing under the strict liability rubric, but the district court also thought that there was a more general duty of care under ordinary negligence that wasn't so tethered to those three things. It's just a duty of care to those to whom you were selling the product. And I'd like you to explain why that's not the case. Sure. Well, first off, the duty is separate from defect. And Godoy in footnote 7 makes clear that negligence and strict liability in risk contribution cases, the product has to be defective. And that's what I didn't understand your argument is that you can't have a general ordinary duty of care unless you have a defective product. And here, given the court's ruling on the duty to warn in the negligence context, that there was not a defective product because they weren't pursuing a manufacturing defect and couldn't pursue a design defect under Godoy. That is correct, Your Honor. I'm sorry to interrupt because I want to follow up on what we were asking you before. I understood that you were making this negligence argument, and then it carries over into your strict liability argument, as to Sherwin-Williams' liability as a manufacturer of white lead carbonate, not just of paint. But you seem to be backing away from that. So if you could clarify that, please. Yes, Your Honor. What our argument is, is on this record, plaintiffs have not made a case that Sherwin-Williams is liable as a white lead carbonate manufacturer. There's no defect for purposes of negligence. The product, because it was paint when it went into all of the years that the court had in strict liability, derived from its application of risk contribution to paint. So it got the consumer expectations wrong. It got the consumers wrong. It got the duty wrong. You have to look at the product. And so at least for purposes of this case, plaintiffs have failed to make their case, and we are entitled to judgment. And on strict liability, not only does the knowledge – I'm sorry, just because I want to make it clear, given your introductory statements, this case would include claims against your client for solely manufacturing the white lead carbonate, not just the broader extension that went to paint manufacturing in general. Is that correct? Correct, Your Honor. And at least in this case, the plaintiffs tried a paint case. They never tried to make out liability as a pigment manufacturer. Sherwin-Williams did not sell white lead carbonate pigment in Milwaukee. They didn't advertise white lead carbonate pigment in Milwaukee. That wasn't part of this record. They never tried to make that case. But didn't they show that Sherwin-Williams, when it made the white lead carbonate, just in a sense sold it to itself internally? It was an internal transfer in the process of making the paint. Yes, Your Honor. We made white lead carbonate pigment. We put it in paint, and we sold paint. And the district court, the application of the law was never to paint, was never to pigment. It was to paint. That's a way to avoid liability on one of these fungible product things, just make sure that you are vertically integrated. Is that right? No, Your Honor. You have, first off, risk contribution. Plaintiffs can bring a claim outside of risk contribution for paint. It only makes that clear. They are free to pursue that claim. You have to be liable, or you have to analyze the liability under Wisconsin law for a component manufacturer. The Schreiber case lays out the standards by which a component manufacturer can be liable. Bedoy cites those standards. That was never attempted in this case. Plaintiffs can try to make that case at a later date, but that wasn't this case, and the court should enter judgment. I see that I'm in the rebuttal. I thought the plaintiffs were pursuing liability both for the manufacturing of the paint that contained the white lead carbonate as well as the white lead carbonate as a product by itself. As a practical matter, Your Honor, all that was talked about through this month-long trial was paint. It was advertisements. I think it was Sherwin-Williams. There was no evidence of white lead carbonate sales in Milwaukee. There was no evidence of white lead. The district court's specific rulings on summary judgment in the negligence and strict liability concept weren't limited to paint. No, Your Honor, they weren't. But he never analyzed the component manufacturer analysis. He went right to the finished product and said, you can be liable for incorporating this into paint. And, again, the defect, the lack of defect in negligence and the knowledge of the plaintiffs here goes across both negligence and strict liability. With that, I'll reserve the rest of my time for rebuttal. All right. Thank you very much. Mr. Bascom. Good morning, Your Honors. My name is Tim Bascom, and I represent Armstrong Containers. May it please the Court, Thomas allows plaintiffs to bring white lead carbonate treatment manufacturers into court without having to prove that they were injured by a specific manufacturer's white lead carbonate. However, Thomas is not – Can I ask you a fundamental question about that? You know, I've looked as probably – maybe not as many times as you have, but I've looked at Thomas a number of times, and it seems that white lead carbonate is even a bit different from the DES in that there are a couple of different forms of it. They don't seem to have different consequences, but there are different forms. Is that right? That's the analysis that the Thomas Court undertook. But you have to remember that Thomas was decided on a motion for summary judgment, so all of the facts were assumed in the favor of Thomas, and the Court specifically stated that in a footnote. But the Thomas Court did not establish a rule of absolute liability for the manufacturers of white lead carbonate. It provided those manufacturers with a pathway out of the courtroom if they could prove by preponderance of the evidence that their product could not reasonably have caused the plaintiff's injuries. Now, Armstrong's evidence that McGregor's white lead carbonate did not injure the plaintiffs was both scientific and historical. With regard to the scientific evidence, the District Court properly admitted expert testimony that, based upon a chemical analysis, there were no paint samples taken from the plaintiff's homes which contained white lead carbonate manufactured by the defendants. So didn't the jury must have rejected this, though, right? Well, and we believe, Your Honor, that the District Court improperly limited the historical evidence that supported the scientific testimony that there was no match between the McGregor Scotch lead and paint, which is the only way that the white lead carbonate from McGregor could have come into these homes. And what happened at trial, Judge, was the fact that the Court limited the defendants in their ability to identify the manufacturers of white lead carbonate in the marketplace. But wasn't that particularly focused on national lead? I think you're getting into the District Court judge's decision to bifurcate the trial. But they must have known that there were at least, you know, DuPont and Sherwin-Williams, that there were other possibilities. Well, that's what's real interesting, Judge, is the fact that the defendants were prepared to present evidence that there were other manufacturers beside the defendants who produced white lead carbonate for the Milwaukee marketplace, specifically national lead, which produced the, which was the dominant player in the Milwaukee marketplace by producing Dutch boy paint. And the District Court prohibited the defendants from even mentioning other manufacturers of white lead carbonate. And in doing so undermined the pathway that Thomas created for defendants to show that their product did not reasonably cause the plaintiff's injuries. So when you say undermine, though, it sounds as though I'm understanding you that you were able to put your expert on and show that the samples analyzed didn't correspond to anything that the predecessor of your client had manufactured, but that somehow your case would have been strengthened if you had also been able to say, and here is this other company that was the 800-pound gorilla in the market, national lead, and get the jury to look at it that way. But is that really necessary? Once you've shown that it wasn't your paint, why does it matter how many other people were in the market? Well, Judge, the jury was left with the mistaken impression, which is not true, that the three defendants or the four defendants in the courtroom were the only manufacturers of white lead carbonate. How were they left with that impression? I didn't see anything suggesting that the plaintiffs were arguing that. I'm not sure how they were left with that. Well, the only evidence that came in at trial was that McGregor, DuPont, Sherwin-Williams, and Arco's predecessor were the producers of white lead carbonate. And throughout the trial, plaintiff's counsel referred to those entities as the industry. So when the jury goes back into the courtroom, and each of Armstrong, DuPont, and Sherwin-Williams, which were the only manufacturers of paint, each of them showed to the jury that paint containing their white lead carbonate was not in the samples from the plaintiff's homes. But the jury goes back to the jury room, and one of the jurors says to his fellow jurors, what did you think of Dr. Brown's testimony? That there was no scotch-laden paint in these homes. And the other jurors would say, well, they all said it wasn't their white lead carbonate, but they're the only ones that made it. That's pure speculation to suggest that the jury instruction was   did you have to prove that you were the only one in the case that said when the burden shifted to the defendant, that you had to prove that you didn't market or produce white lead carbonate, either during the relevant time period, or in the geographical market where the house was located? It didn't say anything about whether or not anybody else produced it. It sounds to me like that's pure speculation. There could have been various reasons. They didn't think you met your burden of proof. Well, and that's the distinction that you have to understand between the evidence of other manufacturers going to the first step of Thomas, whether or not the defendants marketed that product within the relevant marketplace during the time period we're discussing. But that's a different question than whether or not evidence of national lead should have been let in to this phase one of the jury. But just rather than going to the issue of whether or not the defendants were in the market in the first instance, the evidence of national lead goes into, goes into the question of whether once it's established that the defendants are in the marketplace, can they exculpate themselves by showing that their product did not reasonably contribute to the plaintiff's injuries and the trial judge. The district judge to this concern, I'm sitting here thinking, if that was really your worry, it would have been very easy for the judge to have explained your duty is only to determine whether these defendants were in the market. There were other companies that you don't need to concern yourself with or something. The judge was concerned about greatly complicating that first stage of the trial. If national lead had come in since its presence isn't really relevant to the risk contribution theory. That's true. I'm sorry. What the district court did was say, I'm concerned that evidence of NL's presence in the marketplace is going to confuse the jury. Well, many times evidence comes in on one issue in the case and does not apply to another issue in the case. This court could have simply instructed the jury that evidence as to NL or other manufacturers of white lead carbonate goes only to the exculpation defense of whether or not the defendant showed that his product could not reasonably have caused the injury, not to whether that defendant is within the pool in the first instance. Mr. That's correct. That's true. Yeah. It, it, it seems very hard in my view for you to fault the district court for on this point, trying to inject some measure of a way to simplify a case of extraordinary complexity for, for a jury. The moment national lead is injected into phase one and national lead is not present. There's just all kinds of conjecture in both directions that can be put into the air of the phase one proceeding. Well, judge, we agree that no one can be expected to receive a perfect trial, but there are minimum minimum standards and the defendants are entitled to produce evidence. The judge, the judge ruled that Thomas was not, the defense in Thomas was not limited only to the time and place of the manufacturer and marketing of the white lead covenant. The judge ruled that in order to establish the exculpation defense under Thomas, the defendant should be given wide latitude to show that in fact their product did not cause the plaintiff's injuries. And that's why he led with the chemical evidence in showing that the white lead covenant contained in McGregor's paint was not on the walls of these plaintiff's homes. So it consistent with that idea that manufacturers be given wide latitude in terms of evidence to show that they did not actually cause this injury. The evidence of ML was relevant to support those defenses. I want to shift gears for just a moment, please. You, I just want to confirm that I didn't miss something. I did not see your client joining Sherwin Williams arguments with respect to the negligence claim. You joined the strict liability, but not the negligence claim. Is that correct? That's correct. Yeah. If I might, I'd like to spend a minute talking about the applicability of section eight 95.0 46. The beauty of the common law is that it can evolve over time to address changing circumstances. And that's one example of that process is the Thomas case. However, legislatures have the right to say, no, you've gone too far. We're going to vote to change that law. And in fact, when parties come to court and challenge existing common law, courts often say that this is not the right forum for that. If you don't like this law, go to the legislature. That's exactly what happened in section eight 95.0 46. Now the court may ask itself, didn't we already address this in Gibson? Well, yes, you did. But as judge Sykes restated in a recent case, a panel of this court must follow the holdings of the Wisconsin Supreme Court in Erie cases. And it is not bound by the forecast of Wisconsin law made by a previous panel. As we addressed in our brief, the Land's End case, um, clarified that retroactive legislation is constitutional if it's balanced. The Gibson court used a balancing test to reach that result. And in her concurrence in Land's End, judge Ziegler rejected the balancing test and said that the proper test is the rational basis test. But Mr. Baskin didn't overrule either Macy's or Martini, which are the two cases that Gibson relies on. That's true. But, um, judge Abrahamson in the majority opinion did specifically, um, uh, clarify that Macy's applied to a case. It was the change in the law in joint and several liability that talked about a vested right accruing at the time of the injury. That's not the case with, uh, section eight 95.0 46, because the claim for, um, a right under Thomas arose only at the time of the Thomas decision. And these plaintiffs claims for injury occurred well before Thomas. The Wisconsin Supreme court split three, three in the Clark case on the retroactive application of the statute. Isn't that pretty good evidence for us that the issue is unsettled in Wisconsin law and Gibson would stand? Um, no, because I think the land's end case, um, clarified that the balancing tests used by Gibson is, is rejected. It will be rejected by the Wisconsin Supreme court and that the rational basis test applies. And if there is a rational legislative purpose, the legislation survives constitutional challenge. All right. You're just about out of time, Mr. Baskin. So I think we'll stop here and I'll, I'll round you back up to a minute at the end, but let's move. I gather, um, this Fitzpatrick is the first to argue for the appellees. Yes, your honor, your honors. Good morning. Um, on behalf of each of the, uh, police in this case, I want to thank you for your time. And the reality is much of the last 40 minutes that we've heard can be boiled down to two separate requests from these appellants. The first is they actually are looking to limit or to overturn the Thomas Godoy and Gibson's decisions and effectively eliminate risk contribution in white land carbonate cases in Wisconsin. And in the alternative, the appellants requests that this court ignore the jury's findings and the significant evidence that supports those findings. And instead insert itself as a super jury in this matter. The reality is all of the answers to all of the questions and all of the issues, the appellants have posed here, all come back to a reading of Thomas or reading of the joy and a reading of Gibson, which has answered each of these questions. So let me start with a question that arises out of DuPont's presentation and it's briefing. And that, and that's the following. Uh, if, if, as you, as I understand you to be saying your brief, you really are focusing on the pigment, the white lead carbonate pigment, then how do you get past, um, 1924 for DuPont because it wasn't manufacturing pigment after that. And my sort of secondary question is at least Collins is crystal clear that the time that it's put out there in the market and the time that the plaintiff is ingesting it and white lead carbonate seems to be susceptible and the Wisconsin court said that it was to the same analysis, but I don't see Thomas going so far as saying any time a product contains a component part that is unreasonably dangerous in the appropriate ways, then you can also sue because that component part is there. So maybe you could explain how you get DuPont past 1924 and how this incorporation of the, of the pigment into a further product works for you. Um, certainly judge, I'm happy to address that. Uh, the first issue is DuPont manufactured white lead carbonate at its own in 1924 DuPont continued to manufacture white lead carbonate by outsourcing some of the production efforts between 1924 and 1946. That was information that was in front of the jury. And we will agree that DuPont did not produce its own white lead carbonate from 1946 to the late 1960s during that time period. Collins stands very explicitly for the proposition that the incorporation of white lead carbonate pigments into paints by these manufacturers is a basis for the risk contribution concept. And they do it in this way. If you look specifically at paragraphs, an 88 and 89 of the Thomas decision, they're talking about Sherwin Williams there and what they recognize is that each of the three opponents that are before you were all pigment manufacturers. That is undisputed. We sued them as pigment manufacturers. It is undisputed. You are disclaiming the characterization that the appellants are making now that this was a paint case you're saying. I apologize. This was not a paint case. This was a white lead carbonate case. The jury was asked to make findings based specifically on white lead carbonate about ingestion of white lead carbonate injuries caused by white lead carbonate. The defendant's conduct associated with white lead carbonate, whether white lead carbonate was defective. The jury was never asked to make any determination whatsoever concerning lead based paint. So why isn't it important then that chemical analysis of the paint in the homes of the three plaintiffs would identify the manufacturer of that paint. So one of the ideas behind risk contributions, you just have no way of pinning down a manufacturer, but couldn't you tell by analysis that this particular residence has Sherwin Williams paint and this has somebody else's paint? No, that's not possible, Your Honor. And the defendants have raised that for the first time really on this appeal, this concept that you can identify the manufacturer of paint with chemical analysis. That is incorrect. What happened here was the Thomas court held and nobody disputes. And in fact, even the defendant's own expert agreed, there is no way to identify who manufactured the white lead carbonate that is in any layer of paint that is on any wall of any home. That is an impossibility. I thought DuPont's expert did just that. No, DuPont's expert didn't do that. What DuPont's expert did was it attempted based on a limited number of formula cards from a limited number of times to not identify who made the paint, but to see if they could exclude DuPont as a manufacturer of that particular paint. Not the paint, but the pigment. I thought DuPont's expert focused on the white lead carbonate pigment and whether or not that pigment that it produced could be found in the paint at the homes of the plaintiffs. Dr. Palanek was the expert who testified on behalf of all defendants. There is no way, and Dr. Palanek testified, there is no way to identify through chemical analysis, the manufacturer of a white lead carbonate pigment. That is undisputed here. What the defendants asked the court to allow over plaintiff's objection was to see if it was one of their paints that was on the wall. And then they took a massive leap that is not supported by the evidence that if it wasn't their paint, then therefore it could not be their white lead carbonate pigment. That is incorrect. To the extent that paint chemistry and paint analysis came into this case, it was over plaintiff's objection for this very reason, because it inserts this level of confusion into the case. So Ms. Fitzpatrick, let me, let me ask you this. This is a helpful dialogue. Is it your view then that the district court's rulings on the two motions in limine 1147 and 1162 did nothing to change the scope of the liability theory of the plaintiffs? Absolutely, Your Honor. And it did nothing to change in any way, the scope of Thomas. Thomas establishes a paragraph 17, that the defendants in the Thomas case who are the same defendants here were all pigment manufacturers. Every one of these appellants was a pigment manufacturer. Thomas also establishes that once you are a pigment manufacturer, evidence of your production or your promotion of white lead carbonate for use in a residence is evidence that is relevant to your negligence claim. That's clearly spelled out in paragraph 161 of Thomas and specifically in the elements of negligence. Let me ask you the question in a different way. In your view, were the parties operating on the understanding that with respect to marketing or promotion activities, that they were pertinent only during the period that a defendant manufactured white lead carbonate? No. What Thomas and I, let me put it this way. I believe that's what the defendants understood. And I believe that the defendants believed that this case and have agreed until this appeal that all of their conduct in producing or marketing white lead carbonate, including white lead carbonate paints that they made was relevant to their liability claim. What the district court did in that decision was also observed that even if you are no longer producing white lead carbonate, which for Sherwin-Williams was after 1947 and DuPont was after 1946 and Armstrong continued through 1971. But even if you marketed white lead carbonate after that day, you were consistent with the clear language of Thomas, magnifying the risk that had already been created by the production of your white lead carbonate. But it's not the marketing of the white lead carbonate after they stopped manufacturing it. It's the marketing of the products that contained the white lead carbonate. And that's what your arguments to the jury were. You said in your closing argument, I'm asking you to judge their actions, their deliberate decisions to make white lead carbonate, to make white lead carbonate products. That was the whole focus of what the marketing aspect of the sentence and Thomas met that, that marketing the district court judge held included the products that contained the white lead carbonate, not just the white lead carbonate pigment itself, which is exactly what Thomas said. So you agree. I want to make sure, because I think there's at least in my mind and I'm sorry, there's a little bit of uncertainty in some talking around each other. Your theory to the jury here was not just that the defendants could be held liable under the risk contribution theory solely for producing white lead carbonate. Your theory included producing white lead carbonate that was used in a product that contained it. Is that fair? Mrs. Patrick? Yes. And that's exactly what Thomas identifies. And you're relying on that. The basis for your presenting that theory was the district court's ruling that marketing means more than just marketing the white lead carbonate pigment. That marketing means having a product that includes that white lead carbonate pigment. Correct. And the, the, the only place I would, I would disagree with that is we weren't relying on the district court ruling. We weren't relying on the clear language of Thomas. Okay. And your reliance was district court ruling Thomas, your reliance was on that marketing language. That marketing means something more than just the WLC product itself. Correct? Correct. And you don't even need to look any further than paragraph five of the Thomas right at the beginning of the Thomas decision. It identifies that that entire case was brought by a child who had alleged that he had sustained lead poisoning by ingesting lead paint from accessible surfaces, lead paint chips and paint flakes and dust. How do you explain the joy then where the court said that the product was the white lead carbonate, not the paint? So lead paint historically can be made with a number of different pigments. There's white lead carbonate pigment, there's lead sulfate, there's leaded zinc oxide. We as plaintiffs had a very, had a heightened burden. We could not simply prove that these children's alleged lead poison from lead paint. We had to, as paragraphs 11 and 12 of Thomas identify, show something higher, which is that the specific pigment that they ingested was white lead carbonate. That's question one on the jury verdict form. So we could not say they were poisoned by lead based paint and therefore these defendants are liable. We had to go through a chemical analysis to determine that it was specifically white lead pigment, carbonate pigments that were in those paints and to hire a toxicologist that could tie the lead poisoning specifically to the white lead carbonate. So the fact as Thomas mentioned paint over 300 times in the decision, because the Thomas court had absolutely no problem with the concept that the way that white lead carbonate got from the producer onto the wall of a home where it could poison child is either in a prepared paint or in something called the white lead in oil, which is you, you include the pigment with some oil and some dryers and put it on the wall. Thomas had absolutely no concept of problem with that concept. And Thomas, as you read through the fact, specifically references the fact that not only did each of these opponents produce the white lead carbonate, but that each of them included it in paint products, which were then sold to consumers. And in fact, I'm sorry to interrupt. Doesn't the fungibility characteristic characteristic characteristic of the white lead carbonate disappear when you start arguing that it's products that continue, because I think you would agree that the fungibility was really one of the foundational pieces for the court's ruling in both Collins and Thomas. That's correct. And just so the panel understands every single one of the arguments that these defendants are making here were made to the Thomas court and the Thomas court rejected them. There's nothing new or different here. White lead carbonate Sherwin-Williams paints could have contained its own white lead carbonate or someone else's. The fact that it was a was not a DuPont product doesn't mean that it wasn't a DuPont white lead carbonate. I didn't see rejection in Thomas of the argument that a defendant could be liable for paint containing its white lead carbonate. Paragraph 89, for example, which references Sherwin-Williams conduct says when Sherwin-Williams ceased producing white lead carbonate in 1947, it continued to sell white lead carbonate and leaded paint. The Thomas court very specifically heard and recognized the very precise fact pattern that this court heard. There was nothing that this jury heard that was different than what was actually before the Thomas court. And they have invented a distinction between lead paint and lead pigment that simply does not exist in the risk contribution paradigm. The mere fact that in fact, the Thomas court notes this at 19 at page paragraph, I think one 59 of their decision, either one 59 or one 60 where they speak definitely to this. And in the Thomas court, what the defendants here tried to do is they tried to say, Hey, it's not us. It's the paint manufacturers. The paint manufacturers are the ones who are liable. And what the Thomas court said is no, that is not true. And it went to, it spoke to this issue of isn't the white lead carbonate inherently dangerous? Is it poisonous in and of itself prior to its inclusion in paint? And it determined that actually it was, it's not the paint that poisons the child. It's the white lead carbonate specifically that's in the paint. And that's exactly precisely what the Godoy court heard and determined. And they said in the Godoy court statement that we have not, however, applied the risk contribution theory to residential paint pigment. Because no one is asking and plaintiffs are not asking for any application of risk contribution to residential paint pigments. The Godoy looked at this very specifically and Godoy said, the product is white lead carbonate. The Godoy court knew that that white lead carbonate made it to the walls of homes in paint. And what they said is for a design defect claim, because the only issue before the Godoy court was, could we proceed on the design defect claim? And the Godoy court said, no, white lead carbonate is the product and white lead carbonate cannot be applied. So therefore you cannot bring a design defect claim. That was the Godoy opinion. And they were clear that that was the only thing they were deciding. And Godoy helps us because Godoy reaffirmed the fact that this paint, that this pigment gets to the walls of homes and paint does not convert it to a paint case because the product itself,  So you have to be arguing then that the, based on Thomas that the vehicle that happens to be used to get the white lead carbonate on the walls, so to speak, doesn't matter. Here you have this very toxic substance and it's toxic all the way through and it winds up in the walls and the vehicle doesn't matter. Is that it?  could have done or somebody could have taken the paste And when you think about what Thomas was, it was about creating the risk of harm to the public and consequently the pigment manufacturers argument that it's the paint manufacturers were small. And they say the paint manufacturers actually diluted the white lead carbonate toxicity. In other words, the inherent dangerousness of the white lead carbonate pigment existed the moment the pigment manufacturers created it. And Thomas identified and exactly what you're speaking of, which is the idea that the vehicle or the, I'm going to call it the delivery device, the delivery device isn't what makes white lead carbonate poisonous. White lead carbonate simply is poisonous. And the defendant had an intentional scheme and through vertical integration and otherwise to take this poison and to get it to the walls of homes by either incorporating it in their own paint or incorporating it in someone else. And it's important to know, can I ask you, I just want to get the benefit of your time with us today. So I'm going to ask you a separate question and maybe you can direct me to Mr. Baker if I'm asking into the wrong person. And that is, do you believe when you, when you went to trial on your negligence claims that you had to prove some form of a product defect? Absolutely. That is a question for me and absolutely not. And the duty of ordinary care, which was the duty that we proceeded on has been well recognized. And again, you need to look no further than the Collins court and the Collins decision, which was the first risk contribution. And at page 51 of the Collins decision, it identified that the Collins plaintiff was proceeding on a duty of care. So specifically on a negligence theory, the plaintiff must prove that a defendant drug company had a duty of care and breached the duty of care when it produced or marketed DES. And indeed Collins could not be a failure to warn case because if you look at the facts of Collins, the mother ingested DES in 1957, and it was not until 1971 when it was known or knowable that the DES could cause the adenocarcinoma that the plaintiff suffered. That stands in stark contrast to the fact here where each of these defendants knew or should have known about the dangers of white lead prior to even the time they were manufacturing. And Collins is consistent with the Morton decision and the Morton decision again holds that foreseeable acts and omissions that injure another person give rise to a duty of care under Wisconsin law. And that's just talking about an overall generic, you know, towards 101 duty of care, right? It's a duty. Correct. Defendants want to create a specialized body of negligence law for product manufacturers by now saying for a product manufacturer, you have to meet both the elements of strict liability before you can bring a negligence claim and a negligent claim negligent elements before you bring a strict liability. Strict liability requires you to prove a defect that makes the product unreasonably dangerous. Morton holds very specifically that you do not under a negligence claim in Wisconsin have to prove that any product is unreasonably dangerous before proceeding on a negligence claim. So it stands very specifically for the idea that this concept of a defective product, as it's defined by strict liability law in Wisconsin, is not incorporated into the negligence law in Wisconsin as it relates to a duty of care. How do you explain what Godoy said though, that the product has to be defective and gave the three categories of defect. So the three categories of defect under strict liability law, and the one that we proceeded on was failure to warn. But Godoy wasn't limited to strict liability. The only issue that the Godoy court was solely looking at the strict liability claim and whether under the strict liability claim that there was any way for the plaintiffs to allege a design defect claim. That was the only thing that it was looking at. The concepts of negligence and Godoy certainly did not overrule the generalized duty of care that Collins recognized that the other Wisconsin courts recognized, nor did Godoy do what the defendants have you believe, which is creating a complete other field of, of tort liability for product manufacturers. And in fact, if you go back to Thomas, Thomas makes abundantly clear, abundantly clear. And this is in paragraph 160 of the decision that the only thing that they were doing was relaxing the causation standard in this way. Plaintiffs do not have to prove which defendant actually manufactured the white lead carbonate that was found on the wall, but they did have to prove that the white lead carbonate caused their injuries. And they did have to prove that each of the excellent here actually produced the type of white lead carbonate produced white lead carbonate during the relevant time period. Thomas identifies a duty. That's what we proved here, a recognized duty under Wisconsin law. And in fact, the duty that the Collins court relied on for the adoption of risk contributions in its entirety. But the Godoy court certainly was not presented with the issue of whether they should abandon a duty of care that was otherwise recognized in the court in this context, because Godoy decisions solely dealt with strict liability design defect. Is it actionable or not? And so I don't read the Godoy footnote as expansively, certainly as the defendants do. And I certainly don't see it as overturning well-established precedent here. What I think becomes important is this issue of post manufacturer marketing. It's really an evidentiary question. It's not an expansion of Thomas. It's an evidentiary question. Did the district court air in introducing or allowing the plaintiffs to introduce a very small amount of evidence that Sherwin Williams and DuPont continued to market products containing white lead carbonate after they had ceased production. It's hard for me in that instance, it's hard for me to see that they're still occupying the role of pigment manufacturers. And I understood you a while ago in your argument to, to be saying that since they were pigment manufacturers, their production was in their capacity as pigment manufacturers and the marketing was in their capacity as pigment manufacturers. So when they're not pigment manufacturers anymore, why do they still have that status? Well, the Thomas court specifically considered that. And as I directed you to paragraphs 89 where they're discussing Sherwin Williams, they recognize this, um, continued marketing after you see his production. And I think that that's the way to look at it as if Thomas speaks to, if you're a pigment manufacturer, you're in the pool. And once you're in the pool, the question becomes what element evidence is relevant to establish your breach of duty. Certainly it's evidence of your production. And certainly it's evidence of your marketing of white lead carbonate. And in fact, Thomas at one 60 says that that continued marketing for that marketing actually magnifies the risk. It makes the risk from production even greater. And so the question is, did Thomas create a paradigm where the, the minute that you stopped making white lead carbonate yourself in your factory, but you continue to sell it in the same bucket, in the same way to the same consumers, but you just have somebody else's white lead carbonate in it. That doesn't logically make sense that in one sphere, you would be liable, but in the other sphere, you would not. Now defendants want you to believe that this is an extension of risk contribution to lead paint manufacturers. Generally, we are not advocating that. And those are not the facts that are before this court. There's no reason for this court to even concern itself with that because the evidence is clear. And the evidence is clear that the lead carbonate was not produced in the pool because each of these defendants was a pigment manufacturer. I would also say that even if this court were inclined to say that it was error for the court, the district courts to admit this very narrow band of evidence. That still doesn't warrant overturning the verdict. And it doesn't warrant overturning the verdict because there is a plethora, a complete, the vast majority of the evidence, contrary to what Mr. DeGiulio said, went to the defendant's production, what they knew during that time of production, what they were doing to market at that same time. So the vast majority of the evidence still supports the jury's negligence determination and the jury's strict liability determination. This was a narrow band of evidence that was let in because it was, the evidence about their product, the WLC being in other products, which was pretty significant. Well, but there's, during the time that they were producing, there's no doubt that their inclusion of the WLC in their own paint or somebody else's paint, Thomas speaks clearly. That is the basis for liability. It is simply not a paint case because WLC is in either their WLC is in their paint or someone else's, because those are the square facts that were before the Thomas court. There is literally nothing different here than exactly what the Thomas court heard. The Thomas court recited, and the Thomas court relied on in imposing risk contribution. The only difference in the evidence that was heard at this court was the evidence that the defendants introduced on this attempt to exculpate themselves from paint chemistry. And I don't have the time to explain all of the laws in that argument. I think you're at the end of your time. So I appreciate that. I'll turn it over to Mr. Baker. Thank you. Thank you. Thank you. May it please the court. May it please the court, Fred Baker for the plaintiffs. The first thing, I'd like to address for our two issues that were raised earlier today by Armstrong's counsel. The first is the national lead and market share evidence. The district court did not abuse discretion in admitting or not admitting evidence of national lead and market share in phase one of the trial, national lead evidence and market share evidence had absolutely, absolutely no relevance to rebutting the plaintiff's prima facie case. And it has absolutely no relevance to the defendants establishing their exculpatory defenses. As we know Collins and Thomas explicitly adopted risk contribution theory and they laid out exactly how that trial is supposed to proceed as two phases. One is the liability phase and the second phase is the apportionment phase. The central premise of risk contribution theory is to create a pool of defendants, which can reasonably be assumed, could have contributed in some way to plaintiff's injuries. That is that they contribute to the risk of harm. Now the creation of this pool occurs during phase one. It's a binary yes or no inquiry as to each individual defendant based upon that individual defendant's conduct. Is the defendant in the pool or isn't it? It has nothing to do with any other pigment manufacturer. It's a singular inquiry. The inquiry moreover, and this is where you get into the market share issue, it's not probabilistic, it's not relativistic, it's not comparative. It's binary yes or no. Are you in the pool or aren't you? To any consideration of that type of evidence is reserved to the second phase where you apportion whatever liability is found. Evidence about national lead or market share, it's not relevant to establishing our prima facie case, the plaintiff's prima facie case. For example, it does nothing to prove whether the particular defendant produced or marketed white lead carbonate during the relevant time period. Sure, national lead might have, but it doesn't answer the question about whether or not that particular defendant here Armstrong manufactured or marketed white lead carbonate during the relevant time period. Likewise, it does nothing to answer the question as to whether or not there was a breach of the negligence ordinary duty of care. The ordinary standard of care is an objective standard. He can't hear. Mr. Baker. I'm sorry, Judge Sinead, can you not hear me? Judge Wood was trying to ask a question. I can hear you, but I don't think you can hear me. Can you hear me now? Can you hear Judge Wood? Mr. Baker, can you hear me now? We will take a quick break and leave the clock where it is while we solve this. He's got somebody. Can you hear me now, Mr. Baker? I certainly can. I apologize for speaking over you. Oh, no, no. If you couldn't hear me, how would you know? But I have to remember. What was my question? Oh, about the national lead. Can you point me to anything in the way of jury instructions or other evidence in the trial that would address the concern that the jury was just going to scapegoat the people in front of them and assume that they were the entire pool of defendants? Certainly. The jury instructions, Your Honor, spoke specifically. First of all, you have to step back and say, well, what's the risk contribution paradigm? And is it a binary yes or no question? Does this defendant belong in the pool? And the jury was specifically instructed and the jury verdict form specifically goes through defendant by defendant. Do they belong in the pool? And so I think that's the answer, Your Honor. It simply doesn't matter whether or not national lead did or didn't do something. That's for phase two. And it's only for phase two, Your Honor, if and when the defendants establish that national lead belongs in the pool as well. So they must prove national lead's liability to the plaintiff as well. Mr. Baker, isn't it also the case, I had this in mind during this exchange earlier, that in the jury instructions, while there wasn't, it may not have been as express or as declarative as we've suggested, the district court did say that in considering a claim against a defendant, I'm looking at page 6854 of the trial transcript, you must not consider evidence admitted against any other defendants or only as to other claims. And then it made the point that American Sinomid is no longer a defendant and you shouldn't speculate as to why they're not before us. So when you patch those two things together, isn't the district court effectively saying, just concern yourselves with the defendants that are here at trial? That's correct, Your Honor. And more specifically, when you get to the verdict form, the court instructed in the instructions, you should look at each defendant individually. And then if you look at the special interrogatories on the verdict form, it goes defendant by defendant by defendant of the ones that are in the courtroom. It's simply irrelevant as to what national lead was or wasn't in phase 1. And the verdict form, specifically question 3, said did the defendant prove that it did not produce or market white lead carbonate ingested by Owens and then have place for each defendant, not suggesting that they have any burden to prove anybody else did anything. Correct. And the fact of whether or not national lead did anything doesn't inform that question. Again, it's a binary yes or no question focused on that specific defendant. The other issue that Armstrong's counsel raised was whether or not this court should revisit Gibson in light of the statute. And plaintiffs state that there's no basis for this court to revisit, let alone reverse its ruling in Gibson. Nothing in the legal landscape has changed to call the Gibson holding into question. Thomas is still the law in Wisconsin. The case is underpinning the court's analysis in Gibson as this court recognized just a while ago. Matthees and Martin remain settled law in Wisconsin. And Lansin doesn't change the calculus one bit. Well, and critically in Matthees, and this is actually a very well-established proposition, a cause of action that has accrued is a vested property right.  You can't take away vested property rights without compensating them. That happened in the U.S.-Iranian situation many years ago, Danes and more, but Wisconsin isn't purporting to do that as far as I can tell. It is not. And that's actually a distinction between this case and Lansin. In Lansin, Lansin did not deal with a vested property right. Lansin dealt with an entitlement, a change in the entitlement to post-judgment interest. And that entitlement did not last until you had a judgment in place. In contrast here, the right had vested because the plaintiff had been injured by white lead carbon. Could I ask you in connection with this, Mr. Baker? It's probably neither here nor there, but I'm curious. Because of the Wisconsin legislature's actions, plural, there are only so many of these cases that are going to be possible to bring under Wisconsin law because at this point the legal landscape has changed. Do I remember seeing that there's some 100 people who might still be bringing? Who are we looking at who's still out there? There are currently slightly north of 100 cases pending in the federal court. I believe it's 130, 150. 150, okay. But presumably any new case would be barred by the Wisconsin legislation. That would be an unsettled issue, I would posit. But it's not before your court. That's all right. I understand your answer. Okay. Mr. Baker, are those approximate 150 cases all before the same district court just on hold waiting to see the outcome of this one? They are. So again, we submit that this court in Gibson correctly predicted what Wisconsin state law is. The defendants have provided no valid basis to revisit it. The Wisconsin Supreme Court has not overturned Gibson. It had an opportunity to in Clark, and it didn't. The cases relied upon by this court in deciding Gibson are still good law. And so this court should not veer from its earlier panel decision. It should not engage in stereotome predictions of what the state law is and has changed on the legal landscape. The next issue I'd like to address is the public policy issue. While this wasn't addressed by the defendants in their arguments, I'd like to touch on it very briefly. The defendant's argument that the plaintiff's verdicts should be set aside on public policy grounds should be rejected on multiple grounds. First, the defendant's argument can't be squared with Thomas. It can't be squared with Gibson. And their public policy arguments fail under the Fandry factors as well. Before diving deeper into those three reasons, though, I think it's important to keep in mind certain baseline propositions as they inform the public policy analysis from all different directions. First is that in Thomas, the Wisconsin Supreme Court explicitly held that risk contribution applies to white-led carbonate cases. That's not up for debate as a matter of public policy or otherwise. Can I ask you this, Mr. Baker? I didn't see, apart from the more specific arguments that we're discussing, such as public policy factors or discussions about the expert witnesses, I didn't see any standalone argument that the amounts of these three verdicts were so high as to require downward provision on that ground. I know there was the one that had the remittiture, which was for a different reason. But am I correct that there is no argument that these two million, two million and now 800,000 are not being attacked for excessiveness? I don't believe they're being attacked for excessiveness. And in any event, that argument would fail because it seems that there's no evidence that they are. These aren't runaway verdicts by any sense of the word. I mean, so in other words, the only vehicle through which the defendants are complaining about the verdicts is this public policy fandry theory that Wisconsin has. That's correct. They attempt to set aside and obtain what the Wisconsin Supreme Court calls an extraordinary remedy, setting aside these verdicts on public policy grounds. When again, Thomas is still good law. These facts that occur in this case are in complete alignment with the facts in Thomas. This case basically is Thomas, with one exception. And that exception is in Thomas, they were simply allegations that the court was taking as true. Now, they are facts that were found by the jury. So this is actually in a stronger position. So that's your response to the argument that the posture of Thomas was a summary judgment and all the facts were taken favorably to Mr. Thomas. That's correct. And we've proven those facts. And in making the public policy analysis, this court is required to accept those jury findings on the special interrogatories as true. Now, with respect to the public policy factors also, it's important to recognize that this court is not writing on a blank slate. The principal public policy issues that the defendant addressed were also addressed and resolved in Thomas. They were subsequently discussed and confirmed in Gibson. The substantive law with respect to these principal public policy issues has been decided. Principally, the temporal issue that the defendants raised and secondly, the quote, fairness issue that the defendants raised. The Thomas court looked at those, considered them and rejected the defendants' arguments. So on that basis, there is no reason to engage in the extraordinary remedy that the defendants seek. One can go through the Fandry factors and I think we do that sufficiently in our papers, but I think we need to recognize what really is going on here. This is a facial attack on Thomas. The defendants are unhappy with Thomas and so they're simply trying to undo it facially, not as applied, because we've proven the facts that were alleged in Thomas. So they're taking a more frontal attack on it and there's no basis to revisit those public policy issues. They've been decided. If the court has no other questions, those were the principal points that I wish to address. All right, I see none. So thank you very much. And we will turn back to Mr. Schmalzbach if you have anything further. Thank you, Your Honor. Two quick points on rebuttal. First, I'd like to address why the district court's error in expanding the risk contribution doctrine to paint manufacturers was indeed prejudicial. The jury found ARCO, Atlantic Richfield, not negligent and not liable on a strict liability theory when ARCO stopped manufacturing white lead carbonate pigment in 1946. Now, Ms. Fitzgerald is incorrect that DuPont manufactured that pigment until 1946. But even if we did, we would be in the same shoes as ARCO, and so there is at least a significant chance that the jury would have treated us the same as ARCO. And second, I'd like to address why this was an expansion of Thomas. And the best evidence that this is an expansion of Thomas is what actually happened in Thomas on remand. What happened there is that the court, applying the Wisconsin Supreme Court's decision, granted partial summary judgment to DuPont for its post-1924 paint-making conduct and did not grant summary judgment to National Lead for its post-1924 conduct. So what that shows is that Thomas provides a vehicle to hold pigment manufacturers liable under risk contribution, just as Thomas says, but not to hold paint manufacturers in a risk contribution setting. And that distinction that Thomas draws, that works. And this very case shows that it works because the plaintiffs were able to extract a settlement from National Lead. They were able to hold the pigment manufacturer liable who supplied all of the pigments in DuPont's paints after 1924. And so, Mr. Chair, I'd also focus on paragraph 159 of Thomas. I agree that that is an important part of analyzing what Thomas means because in paragraph 159, the Thomas court distinguishes pigment manufacturers from paint manufacturers and treats them differently. And that's further evidence that Thomas does not apply to paint manufacturers. So for all these reasons, Thomas coherently limits the risk contribution doctrine to pigment manufacturers who make fungible white lead carbonate pigments. If the court has no further questions, that's all from me. All right. Thank you very much. Mr. DeGiulio. Thank you, Your Honor. Just a couple of points. The plaintiffs focused a lot on Thomas saying that it decided a lot of issues in this case. The court was clear on page 563 of Thomas that it was just deciding product identification. If you look at footnote two, it says we're not deciding the duty to warn. If you look at footnote four, it says we're not deciding issues of causation or adequacy of those warnings. And if you look at footnote 54, it says we're not deciding public policy. It was simply, does risk contribution potentially apply to white lead carbonate pigments? And when you look at Thomas, what it did... Excuse me, Mr. Julius. I take that as far as it goes. Does it apply to white lead carbonate pigments? But it certainly is considering that question in the light of companies that are putting those pigments in paint and transmitting those pigments through the vehicle of paint. So could you comment on that? Absolutely, Your Honor. And it says, first off, there are different doctrines for product liability of when suppliers can be held liable, when component manufacturers can be liable, when finished product manufacturers can be liable. Thomas didn't purport to try to dice up where along the chain what standards would apply or who would be liable for what. In this case, what Judge Eggerman did is he applied the finished product. And that's why I quoted SWA 52. He applied the finished product of paint. So we have to go back. He applied the wrong law to the wrong product. We have to get it right. We're not saying that you can't find a way through the chain. They haven't tried. You have to follow established law. And Judge Wood, when he suggested a vertical manufacturer would get a benefit, I pointed the court to SWA 22 and 23, where the court looked at bulk suppliers and said if you sell white lead carbonate as a component, you don't have a duty to warrant. So what Judge Eggerman did was actually hold vertical integrators to a higher standard. And at just one point on the duty, the plaintiff suggested there was a specialized body of law. That's simply incorrect. Morden, page 102 of the plaintiff's brief, they cite requires defect in a negligence case. Bedoy dismissed negligence. Specifically, that was the question presented before the court. The pattern during instruction, section 3200, require a defect. And Rich Toole, this court, dismissed negligence failure to warrant under Wisconsin law for failure to defect. This is not specialized law. This is the established law of Wisconsin. Thank you, Your Honor. I want to, just by way of clarification, if you don't mind, is your client's position because of the point you just made and mindful of the district court's ruling at summary judgment on negligent failure to warrant that your client cannot go to trial on any theory of negligence? That's correct, Your Honor. There are three product defects, manufacturing, design, and negligent failure to warrant. When he dismissed negligent failure to warrant, there was no longer a negligence claim in the case. And that was on the facts of this case. He found knowledge by the plaintiff's caregivers. That should have been the end of the negligence claim. And your point is that Thomas, I know Ms. Fitzpatrick, you know, argues to the contrary, but your client's position is that Thomas did not modify that aspect of Wisconsin liability law. Thomas was focused on the causation element of a tort claim. That's correct, Your Honor. And Godoy tells us that defect is still required in a negligence case. All right. Thank you very much, Mr. DeGiulio. Thank you, Your Honor. Mr. Bascom, I think you were just about out of time, but I said I'd give you a minute, so you have a minute. Thank you, Judge. Contrary to what plaintiffs have suggested, we are not asking the court to overrule Thomas. We are simply asking the court to permit the defendants to pursue the pathway that Thomas created to allow manufacturers to prove that they are not liable to the plaintiffs because they did not actually cause the plaintiff's injuries. And in order to accomplish that, we need to be able to present all relevant evidence to a jury, including the fact that there were other manufacturers of white lead carbonate whose product could have been on the walls of the plaintiff's homes, and that substantiates our expert's testimony that our product, the white lead carbonate in Scotch laddy paint, was not in the plaintiff's homes. Thank you. All right. Thank you very much. Thanks to all counsel. This is a big case, but we appreciate the discussion, and the court will take this case under advisement. We will also take a brief recess.